ABNER D. JOHNSTON AND STEPHEN C. DEBRUHL, APPELLANTS, vs. ADAM L. EICHELBERGER, APPELLEE.

A bargains and sells to B one half of a stock of goods not then in his actual possession. B bargains to pay A one-half of the cost of the goods, and one-half of the charges incurred and to be incurred thereon. The cost and charges are to be ascertained at a future time: *Held*, That acts remained to be done between buyer and seller before the sale could be considered complete, and that no present right of property passed. In the same instrument containing the above bargain and sale there was an agreement between the parties to sell the stock of goods as co-partners: *Held*, That it was necessary that a property should pass to the vendee before such partnership could exist *inter se*, and that the vendor had a right to insist upon payment for the goods before the vendee acquired an interest as partner: *Held further*, That acts which may be attributed to common courtesy and to the confidence which generally exists between persons who have agreed to enter into the intimate confidential relation of partners, should not be held to be a waiver of those conditions necessary to be performed before that relation is to exist under the contract.

This is an appeal from a final decree rendered in the Circuit for Marion county. Adam L. Eichelberger filed his bill

Johnston vs. Eichelberger—Argument of Counsel.

in that court setting up a co-partnership between himself and Abner D. Johnston, in the business of selling certain goods and merchandise, which Johnston had before that time purchased in the city of New York. At the date of the alleged agreement, which was in writing, the goods had not arrived at the point where the business was to be carried on. The defendant, Johnston, in his answer, denied the existence of any co-partnership in the goods, insisting that under the terms of the agreement payment for one-half of the goods was a condition precedent to the acquisition of an interest by Eichelberger. After replication there was a reference to a master, a statement of an account, and a final decree for a balance found to be due by Johnston to Eichelberger. From this decree, an appeal was prosecuted to this Court. The principal ground upon which a reversal of this decree is sought, is, that at no time did a co-partnership in the stock of goods exist. This is all of the case made by the pleadings which is examined by this Court. The allegations of the pleadings, and the evidence having a bearing upon this point, is fully stated in the opinion of the court.

*S. M. G. Gary*, with whom was *A. J. Peeler*, for appellants.

Johnston and Eichelberger were never partners *inter se.* Payment for one-half of the stock was a condition precedent to the existence of that relation, and there was no payment.

Looking to the agreement, we find that Johnston had bought a stock of goods in New York, which were to be shipped to Ocala. That Johnston sells to Eichelberger one-half of said stock in consideration of certain covenants. Eichelberger agrees to pay one-half the original cost price, together with one-half the cost and charges that may or shall be expended in transporting said goods to Ocala. The parties agree to sell said goods in Ocala as equal co-partners, &c. To divide profits and bear losses equally.

The first point to be noticed is, that this was an agreement, not for a general partnership to carry on the business of merchants, but a limited partnership for a particular business, to-wit : the sale of a particular stock of goods in the town of Ocala ; a partnership without limit as to duration, and dissolvable at pleasure.

The second point to be noticed is, that the agreement was an entirety ; that the sale and the partnership were inseparable. Johnston was not selling Eichelberger a half-interest in the stock which was to be severed or taken away from the rest of the stock ; Eichelberger's interest was to be *per my et per tout*. The purpose of the agreement was to enable Johnston to realize on half the stock of goods, and at the same time secure a partner ; the sale creating the partnership and the partnership being the inducement to the sale.

The third point to be noticed is, that though the language employed in the agreement seems to impute a partnership *in praesenti*, yet, that looking to the whole agreement, the partnership was to commence *in futuro*.

The goods at the time were in New York, and were to be shipped to Ocala ; the partnership business could not actually begin until the arrival of the goods ; the joint ownership and community of interest could not attach until their arrival. The payment of the money for half the stock, &c., by Eichelberger and his admission to the rights of a partner were to be concurrent.

The fourth point to be noticed is, that Eichelberger could not, under the agreement, claim the rights of a partner until he had complied, or offered to comply, with the covenant on his part of payment. Nothing but a payment, unless this had been waived, would have made him a partner. Even an offer to pay, and a refusal to accept on the part of Johnston, would have simply placed Eichelberger in an attitude to sue at law for a breach of the covenant, or to file his bill in equity for a specific performance ; and a bill for specific performance would have been unavailing in this case, be-

cause to entitle a party to this remedy the partnership should be for some definite term. Fry on Spec. Per., 504. With reference to the word " pay" in this agreement, we hold that the parties in its use meant Eichelberger should pay to Johnston in money, or by Johnston's consent, something equivalent thereto, for half the stock of goods, &c., and that the word " pay," in its technical signification, precludes the idea of a cross demand or set off. 19 Ark., 230 ; 3 Sandf. Ch. Rep., 305. The fact that the parties did not show by their agreement that payment was to be made in something other than money, is evidence that money was intended. "*Expressio unius exclusio alterios.*"

No time being fixed in the agreement, the presumption is that the payment was to be made by Eichelberger concurrently with being admitted as a partner. It is not pretended by Eichelberger that he paid to Johnston the amount of one-half the price of the goods, or that he contributed anything to the purchase of said stock of goods.

It only remains now to inquire upon this point whether the covenants on the part of Eichelberger, which we have seen were not performed, were waived by the parties. We insist that the acts and declarations of Johnston, disclosed by the evidence, do not establish a waiver of the original agreement to pay, and the substitution of a new agreement to extend credit. The answer expressly affirms that defendant always insisted upon payment, and the bill itself admits it. We think there can be no doubt here. In support of our position that the acts proved do not constitute a waiver, we cite Bird vs. Hamilton, Walker's Chy., 361.

*L'Engle & McConnell* for Appellee.

The answer of the appellant, Johnston, admits that a written agreement of sale and partnership was made between himself and respondent, but claims that it was conditional, and this claim is attempted to be sustained by parol testimony.

16

The agreement itself is before the court, and is plain and clear in its terms. It cannot be contradicted or varied by parol testimony. 1 Greenl. Ev., 275, 280 ; 2 Parsons on Con., 548, 549, 550.

The testimony of the witnesses, both for appellant and respondent, shows that this written agreement was carried into effect; that the goods, on their arrival, were received; opened, marked and stored by Eichelberger, to whom Johnston had delivered the invoices ; that the clerks were employed by Eichelberger ; that the goods were sold under his direction, and that, during Johnston's absence, Eichelberger had entire control over the store, and after Johnston returned had equal control with Johnston; that this state of things continued for several months, until disputes arose about other business in which they were jointly engaged.

There was such a delivery as the nature of the transaction and the character and situation of the goods required or permitted, and this, with the subsequent acknowledgment and recognition of the delivery, rendered it complete. 2 Story on Con., 803, 810, 823, 824; Story on Sales, 311 ; 2 Parsons on Con., 323, 324 ; Hilliard on Sales, 88, note 89. It is contended by the appellant that the sale by Johnston to Eichelberger of a half interest in the stock of goods was upon a condition precedent, to be performed before the title should pass, viz : that cash should be paid. Even if this were true, the condition was waived by the act of putting Eichelberger in possession or control of the goods. No time was fixed for payment, and therefore the title passed as soon as possession was given. 2 Story on Con., 32 *et seq.*, and 83 ; 1 Parsons on Con., 435, 436, 440, 443.

The testimony and the master's report show that at the time that this contract of sale was made, Johnston was indebted to Eichelberger in a large sum of money, sufficient to pay the purchase money of the half interest in the goods. This indebtedness was intended to be set off against this purchase money. The weight of evidence shows that such.

was the understanding between the parties. But whether that was the understanding, is unimportant. Even though the terms were cash, an indebtedness of the vendor to the vendee may be set off against a demand for the purchase money. Hilliard on sales, 175, sec. 10 ; 1 East, 375 ; 16 East, 130 ; 1 Bingham, 311 ; 2 Parsons on Con., 249 ; Babington on Set-off, 4 Law Lib., 13, 14, citing Comforth vs. Rivell, 2 Maul. & Sel., 510. The appellants admit the contract of partnership, but claim that it was to begin *in futuro* on the performance of certain conditions. The testimony shows that the partnership commenced at once, and that Eichelberger acted and was recognized by Johnston as an equal partner. But the instrument of partnership is itself sufficient without any testimony. By this instrument, no time is fixed for the partnership to begin, and therefore it commenced from the date of the execution of the partnership articles. Story on Part., 194. Even if no written partnership agreement existed, the acts of the parties were sufficient to constitute a partnership. Johnston, as the evidence shows, admitted the partnership. When in company with Eichelberger, he talked with him about the store in controversy as " our store." He permitted Eichelberger to control the store entirely in his absence, and equally with him in his presence. This state of things continued for months, and after disputes arose about other matters, he consented that the goods and assets should be equally divided and the partnership dissolved ; and not till after the division was made, and after he had seized and concealed the articles of partnership, did he deny the partnership and refuse to permit Eichelberger to have his share of the goods.

His acts established the fact that the partnership did exist as charged in the bill of complaint. Story on Part., 86 ; Gow on Part., 4.

The respondent, by crediting Johnston's indebtedness to him with the price of the half interest in the goods, contributed an equal amount of capital to the business. It was

not necessary that money should be paid in cash; the indebtedness of Johnston to Eichelberger was equivalent to money, and was sufficient. Story on Part., 192; Gow on Part., 10, and notes.

The evidence sustains the allegations of sale and partnership, as alleged in the bill of complaint.

The within contract of sale and partnership shows the terms of partnership.

WESTCOTT, J., delivered the opinion of the Court.

The principal question in this case is, whether, as between the parties Johnston and Eichelberger, a partnership existed at the time of the institution of this suit in the goods, which is the subject matter of the controversy. If it did not exist, then the primary and essential equity in the case is wanting, and it must fail.

Eichelberger insists, first, that such partnership existed by virtue of an instrument of writing executed on the 2d of March, A. D. 1867.

In the second place, he contends that if under the written instrument a partnership did not then exist, it existed by virtue of the terms of this instrument, coupled with the acts of the parties, which transpired between the date of its execution and the institution of this suit.

To determine the first question, we have only to construe the written instrument executed by the parties. To determine the second question, involves a consideration of all the acts of the parties, including the instrument. The instrument is as follows:

STATE OF FLORIDA,
       MARION COUNTY.

THIS INDENTURE, Made this second day of March, in the year of our Lord one thousand eight hundred and sixty-seven, between Abner D. Johnston and Adam L. Eichelberger:

WHEREAS, The said Abner D. Johnston has purchased a certain stock of goods, wares and merchandise in the city of New York, consisting of——————, which said stock of goods, wares and merchandise are to be shipped and transported to the town of Ocala, in the county and State aforesaid;

*Now this indenture witnesseth,* That the said Abner D. Johnston, for and in consideration of the covenants and agreements hereinafter entered into by the said Adam L. Eichelberger, hath bargained and sold, and doth by these presents bargain and sell unto the said Adam L. Eichelberger, one-half of the aforesaid stock of goods, wares and merchandise.

And the said Adam L. Eichelberger, for and in consideration of all the above, hath bargained, covenanted and agreed, and by these presents doth bargain, covenant and agree, to pay to the said Abner D. Johnson one-half of the original cost price of the said stock of goods, wares and merchandise, together with one-half the costs and charges that may or shall be expended in transporting the aforesaid stock of goods, wares and merchandise to the aforesaid town of Ocala.

And it is agreed between and by the parties to these presents, that the aforesaid Abner D. Johnston and Adam L. Eichelberger will sell the said stock of goods, wares and merchandise in the said town of Ocala as equal copartners; and also, that they shall and will bear, pay and discharge equally between them all rents and other expenses that may be required or incurred in the said stock of goods, wares and merchandise, and that all gains, profits and increase that shall come, grow or arise from or by means of the sale of said stock of goods, wares and merchandise shall be divided between them equally, and that all loss that shall happen through or by means of the selling of said stock of goods, wares and merchandise shall be borne and paid between them equally.

IN WITNESS WHEREOF, The said parties have hereto set their hands and seals, the day and year above written.

A. D. JOHNSTON,   [L. s.]

A. L. EICHELBERGER. [L. s.]

Signed and sealed in the presence of

STEPHEN C. DEBRUHL,

W. J. McEDDY.

This instrument, when executed, was left in the possession of a third party, the defendant, DeBruhl, and the answer of Johnston, which is responsive to the bill in this particular, alleges that it was left in the possession of this third party upon the distinct understanding between complainant and himself that it was to be in his (defendant's) control until complainant complied with his agreement to pay for the goods.

Whatever inference may have arisen from a delivery of this instrument, therefore, to the vendee, Eichelberger, cannot arise in this case.

The contract, so far as it relates to an acquisition of an interest in the goods by Eichelberger, is contained in that portion of the instrument which precedes the *mutual covenant* that the parties will sell the goods in copartnership.

Eichelberger could not be a partner unless he acquired an interest. This was certainly a condition precedent. If he did acquire an interest, its acquisition must have been under this part of the agreement.

Johnston bargains and sells one-half of the goods. That constitutes the contract upon his part. Nothing is said as to the price, or a method of ascertaining the price, or as to the mode or time of payment. The price is an essential element of a sale. In cases arising under the statute of frauds, it has been repeatedly held that the price enters into the legal contemplation of a bargain, and that a note or memorandum, which does not furnish evidence of the price agreed upon, is not sufficient to take a contract of sale out of the statute. 5 B. & C., 583 ; 2 Kent's Com., 477 ; 15

Vt., 685 ; Hill on Sales, 230. So also is payment made or to be made an essential element to a sale. If no payment is made and none to be made, it is a mere gratuity. 3 Gray, 113. To determine, therefore, other essential elements of the contract, we must look to the remainder of this instrument. All of it should be construed together, and the intention of the parties derived from a consideration of the whole, and a consistent construction given to each part if possible.

Upon examination, we find that it consists of a "*bargain*" and agreement by the vendee to pay to the vendor one-half of the original cost of the goods, together with one-half of the charges expended and to be expended in transporting them to Ocala. The instrument, therefore, amounts to this: J. bargains and sells to E. one-half of a quantity of goods not then in his actual possession. E. bargains to pay one-half cost price and charges. The charges are not yet incurred, the cost not yet ascertained, the goods not yet arrived, so that these matters can be done by buyer and seller. The contract as to payment was simply to pay without specifying time. There was no express agreement to extend a credit. The general rule in reference to payment is, that when no time is fixed for payment, the sale is for cash. In this case, as the price was to be ascertained at a future date, the payment must be postponed to that time. There is nothing in the contract which can extend it beyond that time, and it is extended to that time *only because the price was to be then ascertained.* In this case, on account of the character of the interest which the vendee was to acquire, the interest of a partner, there was to be no actual separation of the goods or actual delivery of the one-half.

In the sale of personal property, where anything remains to be done before the sale can be considered as complete, whether to be done by the vendor or vendee, as between the parties themselves, the right of property does not pass.

As between buyer and seller, there remained to be done in

this case certain acts which were necessary to ascertain the price and which fixed the amount to be paid, and for this reason the time of payment, where the sale is of an undivided half, as in this case, the acts stated above are about everything that could, under any circumstances, remain to be done, as no separation or actual delivery is required.

If the interest to be acquired by the vendee had been such as admitted an actual delivery, and had the goods been actually present, payment and delivery under such a contract must have been simultaneous acts. 6 Cowen, 110. Because there was to be no actual delivery in this case, it does not follow that the property would pass without payment. The result is, that the vendee must have paid at the proper time, before a property would pass.

No credit was agreed on here. Payment was a condition precedent to the passing of the property. There could be no payment until the price was ascertained—no price could be ascertained until charges were incurred and the goods arrived. These things had to happen and to be ascertained as indispensable requisites to payment. It was urged in argument, and it is true, that a covenant is a good consideration for a sale; but if the covenant itself is to pay generally, specifying no time, it cannot be inferred from this that any credit was to be extended. The rule is, that where no credit is agreed on, or is necessarily implied, the property does not pass without payment or actual delivery, which is generally a waiver. Looking at the entire instrument our conclusion is, that the contract was executory; that there was no completed sale, and that no present right of property passed to Eichelberger. The following cases sustain the correctness of this view. Some of them go much further than this case: 6 East, 614; 1 American Law Rev., 425; 1 Sand., 297; 7 Wend., 406; 15 Johns., 351; 3 Wend., 112; 3 Cowen, 84; 6 Cow., 101; 13 Mass., 88; 25 Penn., 208; 4 Seld., 291; 10 Hump., 337; 21 Vt., 147; 12 Pick., 83; Amer. Law Reg., May, 1869, 319; 1 Camp., 427. While the facts are not

similar and the cases widely different, yet the general views expressed by this court in the case of Stafford vs. Anders, 8 Fla., 40, go much further in the requisites laid down to make a sale complete than we do in this case. It appears from the evidence that there were unadjusted accounts be- tween the parties at the time this instrument was executed. It is insisted that Johnston was indebted to Eichelberger in a sum equal to the cost and charges of one-half of the goods, and Eichelberger insists that the existence of this debt was a virtual and legal payment according to the terms of the contract. As this matter is several times mentioned in the testimony, it is proper, while considering the effect of this instrument in other respects, to determine it in this respect.

Mr. Hilliard, in his treatise upon sales, remarks : " With regard to the payment of goods purchased in conformity to the general rule, which requires such payment to perfect a sale, a vendor is not bound, without special agreement, to receive anything for the price *except cash.*"

The case of Lorin vs. Smith, 1 Denio, 573, was a sale of merchandise for cash, to be paid for on delivery. The vendee tendered the overdue note of the vendor. It was held in- sufficient.

Had the property in the goods passed under this agree- ment, then in an action for the price, E. might have set off J.'s indebtedness, although his (E.'s) contract was to pay ready money. That is the case cited by appellees, and is not this case.

It only remains to consider the subsequent acts of the parties, coupled with this instrument.

Did a partnership exist by virtue of the two combined? The evidence upon the subject may be divided into two parts : First. The acts and declarations of the parties before Johnston left for New York. Second. Acts and declarations of the parties after his return and before the commencement of the suit.

It appears that Johnston left Ocala for New York in a

few days after the execution of this instrument, and before the arrival of the goods. Hearing before his departure that the goods were about to reach Ocala, he made arrangements to have them marked by clerks employed by Eichelberger in his own store in the same town. As to this matter, which is all that happened before Johnston left, the testimony is substantially as follows :

W. P. Trantham, an employee of Eichelberger, testifies that a short time after Johnston returned from the North, he and Eichelberger came to me ; Johnston gave me the invoices of all the goods, and said that he wanted me and Mr. Roof to mark the goods when they arrived ; he also said that he wanted me to compare the prices with the prices of goods Eichelberger had purchased about a year before ; Mr. Roof and I were then employed exclusively by Eichelberger ; the goods, when they arrived, were opened, marked and left by us in charge of the clerks in A. D. Johnston's store.

Wm. H. Anderson testifies, that the goods were opened and marked by Mr. Eichelberger's clerks, assisted by himself and Mr. Miller ; Johnston was absent during this time, and Eichelberger gave instructions and exercised general control. Eichelberger, who was examined, says nothing in reference to what happened between Johnston and himself before Johnston left.

Johnston testifies, in reference to this matter, that before he left he received notice that the goods would arrive soon ; that he employed D. A. Miller as clerk, and authorized Eichelberger to hire Anderson, and requested Eichelberger when the goods came to hand to have them opened and let the clerks commence selling ; that he did not know when he would return, and he did not wish the goods to remain boxed up ; that he authorized Eichelberger, as his agent, to receive, open and mark the goods on their arrival ; that he would have entrusted him to do this if he had not been his agent, as he had the clerks to do so ; that he did not do this

on the faith of the agreement.   Upon the cross-examination, he states that he never told Eichelberger in express language that he was to act as his agent; that he agreed to pay him no compensation for the service; he simply told him what to do.   He says that he *always refused* to acknowledge any *interest in Eichelberger* until he (Johnston) was paid.

Eichelberger states, in his bill, that Johnston was indebted to him at the time of the execution of the articles of agreement, and alleges that he " has always been ready and willing and *repeatedly offered* to set off this amount against his indebtedness to Johnston," which said *Johnston refused to accept*, " but demands that your orator make his payments in cash," while he himself refuses to pay any of his indebtedness to your orator, by reason of all of which your orator has always deemed himself excused from any further or other compliance with his said stipulation, and has deemed the said payment made, virtually and legally, by the existence of the said debt.

This is substantially what occurred, according to the allegations of the pleadings and the evidence of the witnesses.

Eichelberger's control in Johnston's absence, to have any effect, must be proved to have been done in accordance with authority from Johnston, and the authority, so far as proved, does not establish anything beyond a simple request to have the goods marked and opened.   It appears for some reason, that Johnston was desirous that a price should be fixed upon his goods, with reference to the prices charged by Eichelberger for goods sold by him.   This was perhaps to avoid any difficulty with E. as to estimates of charges.   However this may be, Johnston, neither by his acts nor language, admitted a property of Eichelberger in the goods.   He gave the instructions in his own name.   He swears that he never intended E. should have an interest until payment, and E. admits that Johnston refused his repeated offers of his own paper in payment for the goods.

This evidence discloses no act which amounted to a waiver

of his rights of payment, and it does not establish a partnership. What was done, even according to the witnesses of complainant, was nothing more than simply giving an authority, in Eichelberger's presence, to Eichelberger's employees, in his individual store, to open and mark the goods upon their arrival, which act was performed by these employees, assisted by others in the employment of Johnston. When the goods were marked, they were left in A. D. Johnston's store.

After the latter part of May, it is admitted that Johnston took exclusive control of the goods, denying all interest in Eichelberger. Johnston returned from New York about the first of April. We proceed to examine the evidence covering this period, and to state its results as to the rights of the parties.

W. P. Trantham, an employee of Eichelberger's, and who was not connected with the store in which these goods were, says, in his direct examination, that during this time a mercantile business was carried on with these goods; that it was *his understanding* that the business was carried on by Johnston & Eichelberger. The subsequent portion of his direct examination relates to a division of the goods in the latter part of May, which we will consider subsequently in connection with all the testimony relating to that matter. Upon the cross-examination, the witness states that he was in the exclusive employment of Eichelberger, in E.'s individual store; that his understanding that the business was carried on by Johnston & Eichelberger was derived from Eichelberger, who told him so; that he was never told so by Johnston positively, but has heard Johnston speak of the mercantile business as our business, in speaking with Eichelberger at different and several times.

D. A. Miller.—This witness, upon his direct examination, testifies that he was a clerk in the store; was employed by Johnston early in March; that Johnston, when he employed him, said that a person named Oxner expected to be em-

ployed by him, but that Eichelberger objected ; that I would be assisted by a clerk who was highly recommended, and had been employed by Eichelberger, and that he and Eichelberger would sell out that stock of goods and then get a large stock of groceries. (This no doubt all occurred before Johnston left, and even before the goods arrived.) The witness says further, that Eichelberger on one occasion took some flour from the store; that he heard Johnston remark that Eichelberger, instead of letting the goods remain in the store to be sold to defray the planting expenses, was taking them to his own store, charging himself at cost prices, and selling them out at a profit. The witness testifies *that he cannot say that he ever heard Johnston admit any interest of Eichelberger at any other time.*

W. J. McEddy testifies, that he heard Johnston say that he had sold Eichelberger a half interest in his store, *but did not know how about the pay;* heard Eichelberger at one time say to J., let us get money for things for the plantation out of the common store ; we then went to the store *known as A. D. Johnston's store,* and I got the money.

W. H. Anderson testifies : Was the book-keeper ; store was known as A. D. Johnston's store ; was so advertised ; was employed as clerk by Eichelberger ; while Johnston was away, received instructions from Eichelberger until Johnston returned ; on his return, he assumed control of the store ; although present in the store, he cannot say that Eichelberger at any time after Johnston returned gave any directions as to the management of the store or the sale of goods, or exercised in any manner any control or authority in the store ; he came and purchased goods, and they were charged to him ; the clerks in the store carried it on as Capt. Johnston's store ; he had the principal management and control of it after Capt. Johnston returned ; Eichelberger controlled the store until Johnston returned from the North ; afterwards Johnston was at the store almost every day, and we regarded him as the manager ; Mr. Eichelberger gave

instructions, I recollect, in one instance, which Capt. Johnston countermanded ; we regarded Mr. Eichelberger as interested in some way.

Eichelberger, although examined as a witness, was not interrogated in reference to the particular matter of admissions as to partnership relations. His idea was, that he was entitled to an equal interest in the goods, because Johnston was indebted to him in an amount equal to the sum he was to pay.

Johnston testifies that he does not recollect all the conversations he may have had upon the subject, but that he never intended that Eichelberger should have any interest until he paid for the goods, and that he repeatedly told him so. This agrees with Eichelberger's admissions in the bill. Johnston says : " I refused all the time to let him have the goods until he paid for them, both before I went and after I returned."

Jas. H. Johnston's testimony relates almost exclusively to matters occurring in view of agreements made looking to an arbitration. His testimony, so far as it relates to the matter of partnership, is that the store was known by common reports as the store of Johnston & Eichelberger ; that a book in which accounts were kept was marked A. D. Johnston & Co., and that during his presence in the store for a few days in the latter part of May, when the parties had agreed to divide the goods, and to an arbitration of all matters of difference, they both appeared to exercise equal control over the goods. They spoke of the stock or store as our stock and our store.

What does this testimony amount to ? Leaving out Trantham's understanding, derived from what Eichelberger told him, his testimony amounts to no more than that he heard Johnston, in conversing with Eichelberger at different and several times, speak of the business as our business.

The other witness, Miller, says that Johnston, when he employed him, which was no doubt before he went

North, and after the execution of the agreement, seemed desirous of employing persons acceptable to Eichelberger. He says that beyond Johnston's objecting to Eichelberger's taking goods and selling them in his own store at a profit, he could not say that he ever heard Johnston admit any interest of Eichelberger. McEddy says that Johnston said he had sold an interest to Eichelberger, but did not know how about the pay; that he heard Eichelberger mention the store once, in Johnston's presence, as the common store.

Anderson, who was the book-keeper, says that the store was advertised as the store of A. D. Johnston, and was so known by the clerks, but that they believed that Eichelberger had some interest; that Johnston, on his return from New York, assumed control of the store; that although the witness was present in the store most of the time, he cannot say that Eichelberger gave any general directions or exercised any control after Johnston returned; that he recollects one instance only in which Eichelberger gave instructions, and that Johnston countermanded them; that he has heard Johnston say that Eichelberger had not come up to the agreement, and he was therefore unwilling to allow him an interest in the goods.

Eichelberger says nothing upon the subject when examined as a witness, while in his bill he admits that Johnston demanded cash for his goods; and Johnston states expressly that while he did not recollect all the conversations he had with Eichelberger, he did refuse at all times to allow him an interest until he paid for it.

Jas. H. Johnston testifies that the parties spoke of the store as our store, and that a book in which accounts were kept was marked Abner D. Johnston & Co.

What appears here is not sufficient to prove a waiver by Johnston of his right to payment for the goods, or an acknowledgment that he consented to Eichelberger's having the interest of a copartner without payment according to the agreement. Calling the store our store, our business, &c.,

opening the books in the name of the contemplated firm, expressions of intention upon the part of the parties to sell out that stock and buy another, are expressions and acts which each of the parties might indulge in without a waiver of antecedent rights. Especially is this true when the partner in possession, Johnston, exercises general control, and shows a claim of exclusive general control by countermanding the orders and directions of the contemplated partner. They are expressions made in view of a compliance with the agreement, and in the belief that everything would be done that should be. It shall not be held, under such circumstances, that Johnston should have directed his intended partner to remain out of the store, and it was perfectly natural that they should have spoken of the business in the manner that they did. Expecting and insisting upon payment, Johnston may have permitted the whole community to infer that such a relation existed by his silence, or by acts of common courtesy extended to his contemplated partner, relying upon a compliance by him with his contract; and yet, if he failed to perform his covenants, these acts, done upon the understanding of payment and fair dealing upon his part, could not and should not operate to excuse him from payment. Acts which may be attributed to common courtesy and to the confidence which generally exists between persons who have agreed to enter into the intimate confidential relation of partners, should not be held to be a waiver of conditions necessary to be performed before that relation is to exist under their contract.

These views and conclusions are fully sustained by the adjudications of the courts in like cases.

We find this case in 1 Freeman's Chy., 357 : A agreed to give his notes for a certain sum to B for half of B's stock in trade, the two to be partners thereafter. B, believing that A could execute the notes at any time, suffered him to act as a partner, and to buy and sell goods in the partnership name. A failed to execute the notes for his share of the

stock, and advanced no money to the concern.  Held, that the delivery of the notes was a condition precedent, and that no partnership existed until A complied with it ; that a court of equity would lend B its aid to recover the goods ; that A would have no right to an account and division of the profits since their connection, and that the fact that the parties held themselves out to the world as partners, was not a waiver of the original understanding ; that a waiver does not take place unless there is clear evidence of an abandonment of the original terms or the substitution of new ones.

Even if it was admitted that the parties, Johnston and Eichelberger, held themselves out to the world as copartners, which is not the fact, yet Johnston's always demanding payment before he would admit Eichelberger's interest, and E.'s noncompliance with his part of the bargain and agreement, would prevent the existence of the relation of copartners *inter se.*   The case of Bird vs. Hamilton, 1 Walker's Chy., 361.   In this case the books were kept for thirty days in the name of the contemplated firm.   The language of the articles was, that the parties " agreed to enter hereby into partnership."   The articles, however, provided that Bird was to furnish one-third of the capital stock.   This he neglected to do.   The court held that where the question of partnership arises, not with third persons, but between the parties themselves, the agreement out of which the supposed partnership arises is to be construed as any other instrument between the parties ; that is, that their intention should control, and that while in this case the letter of the agreement imported a partnership *in presenti*, yet it was apparent from the whole instrument that the contribution of one-third of the capital stock by Bird was a condition precedent to the existence of a partnership *inter se.*   The court held further, that the fact that the business was carried on for the period of thirty days in the name of the proposed firm, was no waiver, and that the party in default was not entitled to the rights of a part-

ner. The chancellor, in this last case, speaking of the act of carrying the business on in the name of the firm for a short period, says: "It should not be construed into a waiver of the agreement requiring Bird to furnish a third of the capital. To give such a construction to what was intended as a favor to Bird, and nothing more, would be hard indeed. It would be saying to persons hereafter in like circumstances, show no indulgence whatever to a defaulting party, or it will be construed into a waiver of your rights."

In the latter part of May, it appears that the parties agreed to submit all their business matters to arbitration for settlement, and it is claimed that what transpired on that occasion is material in this connection.

Everything which occurred at this time which may be considered as admissions of the relation of partnership, has been considered. The matter of arbitration, with all agreements entered into with strict reference to it, became inoperative by revocation of the authority given by Johnston, and it is not perceived how this matter is material. The parties did not seek to form a partnership at this time, but to settle all mutual accounts. We will, however, examine the testimony, and state our views in reference to it.

Jas. H. Johnston testifies: I was instructed to take an account and make an equal division of stock, one part to be set aside for A. D. Johnston, the other for A. L. Eichelberger; this division was made in the latter part of May; I received these instructions from A. D. Johnston, A. L. Eichelberger being with him; with the assistance of the clerks I took the stock, and after several days' labor, divided the goods; I set apart one-half for Johnston and the other for Eichelberger, each so marked as to distinguish them; each of the parties took goods from their respective parts, and spoke of the shares as their shares; having divided the goods according to instructions, I left them in the store in charge of the clerks.

S. D. McConnell testifies: Was called on by Eichelber-

ger to act as an arbitrator in adjusting some accounts between him and Johnston; both were present and took part in giving the instructions; we were told that it was desired that we should adjust all accounts then existing between the parties, including the store in Ocala and the accounts in the farming copartnership; the manner of dividing the goods was discussed in my presence; they agreed to call in James Johnston to take an inventory and divide them equally; Johnston said he could dispose of his part to better advantage; nothing was said when we received the instructions as to E.'s paying cash for the goods; I heard Johnston say, during the progress of the arbitration, that it was not right that Eichelberger should get *his goods* at cost, while Eichelberger was charging him full retail prices. The witness gives his opinion as to the matters done and the acts of the parties in his presence. He says: From what was said in my presence by both parties, I was satisfied at the time that the amount that was due to Eichelberger from Johnston on store account, when ascertained, was to be allowed.

W. P. Trantham testifies to the fact of division, and that he received goods from the store, at Eichelberger's request, from a pile which one of the clerks pointed out as belonging to Eichelberger. Miller testifies that he was instructed by Johnston to divide the goods in two piles, one for himself and the other for Eichelberger; that Johnston said that he and Eichelberger could not get along together; that he was afraid E. would swindle him; that he would rather have five dollars than a thousand with some one else. The goods were divided and remained so several days, when Johnston instructed me to put them together again, and I did so; I delivered some of the goods after they were divided to Eichelberger; Johnston gave as his reason for putting the goods together again, that he had sold E. a half interest, but that he could not " ante up," and that he would not allow him an interest in the goods until he did.

Anderson testifies that he knew of the division, and that

he heard Johnston say that E. had not come up to the agreement, and that he would not allow him. an interest in the goods.

Eichelberger, in his amended bill, alleges that at the time of the sale and thereafter, Johnston was indebted to him in a sum equal to the amount due for the goods, and that he has always been ready and willing to set off this amount against his indebtedness to Johnston, " which said Johnston refuses to accept, but demands that he pay in cash, while he refuses to pay any of his indebtedness to your orator; by reason of all of which, your orator has deemed himself, as he still does, discharged and excused from any further or other compliance with his said stipulation to pay his proportion of the amount of said goods and expenses to said Johnston, and has deemed this said payment as made virtually and legally, by virtue of the existence of the said unpaid debt." As a matter of course, these admissions in the bill of the plaintiff are evidence of the best character.

In his testimony, Eichelberger says that Johnston and himself agreed to submit all of our matters of account to arbitration, and we agreed there, in the presence of the arbitrators, that any balance that was due to me was to be credited to me as a payment for the share which I had purchased in the stock of goods. According to this, Johnston had never agreed, up to this time, to a payment in his own paper, and it negatives the view that Johnston supposed or consented to Eichelberger's having such an interest without payment. But from the answer, as well as from the bill and the evidence, we derive no confirmation of this statement of Eichelberger, as we shall presently show.

Johnston testifies that he authorized Jas. Johnston, Anderson and Miller to divide the goods in his store; that his reason for so doing was to let Eichelberger have one-half of the goods, provided he paid for them; that while he does not recollect all the conversations he may have had on the subject, he never has recognized any interest of Eichelberger

in the goods, nor did he ever intend him to have any interest until he paid in money ; that he did not and does not now know the state of the accounts between them, and that the division was authorized upon our understanding that the goods were to be paid for in cash ; that there was no understanding that if a balance was in favor of Eichelberger, it was to be allowed him in payment of the goods. After the division I put the goods together, because he refused to pay cash, and wanted to have balances on old accounts allowed. We proceed to examine this testimony.

James H. Johnston's permitting Eichelberger to take a part of the goods without payment, when his authority did not extend to a delivery, but only to a division, is not a waiver by Johnston of his right of payment, nor did these acts pass the property to Eichelberger. The proper inference, even if it is established that Johnston consented to his taking the part, is, that Johnston did this with the belief that Eichelberger would pay for the whole when all of the part which Johnston intended to let him have was delivered. Johnston testifies that as soon as he found that Eichelberger was not going to pay, he instructed the clerks to put the goods together, and the clerks say that this was about his language at the time. Lord Ellenborough, in a similar case, held that the vendor, by such an act as a delivery of a part, did not change his rights or his property in the remainder. 1 Camp., 427.

Submitting all accounts to arbitration, agreeing to an inventory and division of the goods in the store, expressing nothing as to Eichelberger's paying in cash, and saying expressly that it was not right that Eichelberger should get *his* (Johnston's) *goods* at cost, which is about what the testimony of McConnell amounts to, does not establish an agreement upon Johnston's part to accept any debt to be ascertained by the arbitrators as a payment, nor do these things constitute a waiver of his rights by Johnston. It is true that this witness, after stating what did occur, gives his opinion of

the matter, and says : " From what was said in my presence
by both parties, I was satisfied at the time that the amount
that was due to Eichelberger was to be allowed to E. in set-
tlement for that part of the goods which he was to receive
after the division." This is not evidence. The witness no
doubt believed, as matter of law, that under the original
agreement a property passed to Eichelberger. He therefore
supposed that E. was entitled to the property without pay-
ment ; that credit was extended, and he would very natu-
rally and properly be satisfied that the amount was to be
set off.

The admissions of the bill, which are consistent with the
answer and the testimony of Johnston, to the effect that he
always demanded cash for one-half of the goods, are cer-
tainly sufficient to establish the fact that Johnston never
waived his right to payment in cash.

Eichelberger's testimony, to the effect that Johnston and
himself agreed, in the presence of the arbitrators, that any
balance that was due to him was to be credited as a payment
on these goods, is not corroborated by the testimony of the
arbitrators in his behalf. It is in conflict with the allegations
in his bill, and is denied by the answer and evidence of the
defendant. It is, besides, established by the testimony of
Miller, as well as the testimony of Anderson, that Johnston
directed the goods to be placed together, and gave as his
reason for so doing that he would not allow E. an interest
until he came up to the agreement ; that E. could not "ante
up " or pay, &c.

In addition to this, it is true that either Johnston or
Eichelberger could have withdrawn their consent to the ar-
bitration at any time. 2 Tidd's Prac., 823. Upon the revoca-
tion of the authority of the arbitrators in this case, this
agreement, even if proved, being made in reference to and
in view of the arbitration, could not be effective as a gen-
eral agreement to accept payment in his own paper. This
was the case, also, with all agreements made in strict refer-

ence to and in consideration of the submission of all accounts to arbitration. Our conclusion is, that there was no partnership *inter se*, and the bill should have been dismissed upon the hearing.

The decree is reversed, and the cause remanded for such proceedings as are conformable to this opinion.

HART, J., delivered the following concurring opinion :

Johnston and Eichelberger were partners in a plantation. Johnston owed Eichelberger. Eichelberger had a bar-room business also. Johnston determined to get a stock of merchandise for sale ; rented a house from Eichelberger for that purpose ; went to New York, purchased the goods, returned to Ocala, and, before the goods were shipped, made the said contract of sale of half of them, and of partnership, the written contract being left with the attorney who wrote.it ; and Johnston went away again.

The goods were brought to Ocala in Johnston's absence, and were opened and marked by Eichelberger and his clerk, acting with Johnston's clerk. Johnston returned, and the business of selling the goods was conducted by both Johnston and Eichelberger ; the latter alleging now that he was a partner under and by virtue of the said written contract of sale and partnership, and Johnston alleging now that although he humored Eichelberger along, in hopes that he would perform his contract by paying for half the goods, and thus become a partner, yet he never considered him as such ; and that, in fact, as between the two, he never was such ; and that he (Johnston) even consented, after awhile, to divide the goods with him, still hoping that he would pay cash for said half ; but that, finding at last that he would not so pay for them, he broke up the dividing arrangement while it was in progress, denied any partnership, kept the whole stock, and still denies that there was any partnership between them, Eichelberger having had ample time and

opportunity and not having paid for half the goods, as by his said contract he had undertaken to do.

Eichelberger contends that under the said contract, and by the part he took in opening and selling the goods, he became the owner and had possession of half of them, and was a partner.

If the contract was an executed sale, and established a partnership, Eichelberger had a remedy in chancery as to that partnership, and all the affairs connected with it. If not, the remedies of the parties for their claims against each other lay only in a court of law, and the court of chancery had no jurisdiction. The doubt can be solved only by a correct legal interpretation of the aforesaid written contract.

The Circuit Court construed the contract to be an executed sale, and to have established a partnership, and that tribunal also allowed a set off, which was pleaded in an amended bill, after answer, to prevail, and thus to add to the amount decreed against Johnston. It is from that construction, ruling, and consequent decree against Johnston, that this appeal is taken.

What was the intention of the parties to this agreement, as gathered from the writing itself? It is difficult to construe it, as though the subsequent acts of the parties were unknown. They are known, and leave their impressions upon the mind, in spite of efforts to disregard them. The idea that Johnston intended to have a cash payment from Eichelberger for half of these goods before the partnership was to begin, without regard or reference to any debt then due or owing by him to Eichelberger, and that Eichelberger intended to pay Johnston for said half of the goods, not in money, but with said debt; in other words, that one of the parties meant one thing and the other the reverse of that thing, without either of them using any words in the written instrument expressive of his intention, is found only in their subsequent acts and allegations detailed in the record of the case, which resulted in the decree of the Circuit Court ap-

pealed from.   It may be that this idea would have suggested itself if the instrument of writing could have been and had been submitted in some condition wholly isolated from the subsequent acts and allegations of the parties; but the written instrument, subsequent acts and allegations are all submitted together, and it is, in reality, difficult to separate them in order to ascertain from the written instrument alone what the parties must, under the law of the interpretation of written instruments, be held to have intended by the language used by them.   Yet the effort must be made, for the correct decision of the case, one way or the other, may depend upon the result of that mode of inquiry, and no other.

The writing itself states nothing about any other business transactions by or between the parties, or obligations or claims by one to or against the other.   It is strictly confined to this particular stock of goods, and to what is to be done with it.

It is contended by the appellant that the word *pay*, in the writing in question, means payment in money, and that from the language used the partnership was to commence only at the time of payment; and by the appellee, that it may be legitimately construed to mean the equivalent of money, to-wit: the said debt due by Johnston to Eichelberger, and that the sale was complete and finished, and the partnership established at the date of the instrument of writing.

The language of the instrument alone shows that it was the intention of Johnston, in consideration of the covenants and agreements of Eichelberger, to sell half of the said stock of goods to him, and establish a partnership with him in the sale of this stock of goods; and of Eichelberger, to purchase and to pay for said half, and to establish said partnership. The main question is, whether Eichelberger was bound "to pay" in money, or whether it was optional with him "to pay" in something else, to-wit: in an unliquidated demand which he claims that Johnston owed him.

The law of the interpretation of written contracts, applicable to this question, is stated by the judges and commen-

tators as follows : " In the absence of any special agree-
ment, the only payment known to the law is by cash, which
the debtor must pay or tender to the creditor when it was
due.   The tender should properly be in cash, and must be
so if that is required ; but a tender in good and current bank
bills is sufficient, unless it be objected to because they are
not money."   Parsons on Mercantile Law, 80, 81 ; 9 Pick.,
542 ; 7 Johns., 476 ; 2 Fairf., 475 ; 2 C. J., 16, note; 3 T.
R., 554.

" A sale of goods is the exchange thereof for money.  More
precisely, it is the transfer of the property in goods from a
seller to a buyer for a price paid or to be paid in money.  It
differs from an exchange in law; for that is the transfer of
chattels for other chattels, while a sale is the transfer of chattels
for that which is the representation of all value."   *Ibid*, 41,
and notes.   Counsel for appellant cite Hill vs. Austin, 19
Ark., 230 ; Green vs. Storm, 3 Sandf. Ch., 305.

Counsel for appellee contend that even if it were true
that the sale depended upon a condition precedent of pay-
ment in cash, there was a delivery of the goods, by which
the condition was waived, and cite 2 Story on Con., 803,
*et seq.*, and 1 Parsons on Con. 435 and 6, 441, 443.   It is the
written instrument alone that is now under consideration.
" Articles of agreement and deeds of conveyance are to be
construed by themselves, and not by subsequent acts of par-
ticular parties."   3 .Barr, 72.   The reference to 1 Parsons on
Con., is an unfortunate one for appellee.   Viewed from the
position of the appellant, the law as there announced is
strongly in his favor, nor is it seen how the counsel for ap-
pellee can construe it otherwise.   The written instrument
states substantially that Johnston, who had purchased the
goods in New York, and which were to be shipped and trans-
ported to Ocala in Florida, in consideration of the covenants
and agreements entered into by Eichelberger, sold half of
them to him ; and Eichelberger, in consideration thereof,
bargained, covenanted and agreed to pay Johnston half the

original cost, and half the expense of transportation of the whole stock to Ocala; and both parties agreed to sell the whole stock in Ocala as equal partners, and share equally in the expenses of sale and losses and in the profits, no time nor kind of payment being mentioned. The consideration on both sides is expressed. There was no delivery, could be none, and in fact it was an equal partnership, and not a delivery by one to the other that was intended. Payment was intended to be made, but no receipt of it appears in the instrument by indorsement or separately, and that intention of the parties does not appear to have been performed. It was a very important part of the contract. Without it, the bargain could not be perfected. Without it, Eichelberger could not own the said half of the stock and act as partner, except under some other agreement. Parsons states the law as follows: "All that is essential to the sale of a chattel at common law is the agreement of the parties that the property in the subject matter should pass from the vendor to the vendee for a consideration, given or promised to be given by the vendee. Yet when the parties have not explicitly manifested their meaning, the law makes some important inferences. There is a presumption that every sale is to be consummated at once; that the chattel is to be delivered and the price paid without delay. If, therefore, nothing appears but an offer and an acceptance, and the vendee goes his way without making payment, it is held to be a breach of the contract, (which is presumed to have contemplated payment on the spot,) and the vendor is not bound by the sale." And in a note states, "The law of sales as it stands at this moment, is at least as old as the year books." In 14 H., 8, 17 b, 21 b, in the Common Pleas, the law upon this subject is thus stated by Pollard, J.: "Bargains and sales all depend upon communication and words between the parties; for all bargains can be to take effect instantly, or upon a thing to be done thereafter. They can be upon condition, and they can also be perfect and yet no *guid pro*

*quo* immediately. And all this depends upon the communication between you and me; as that I shall have £20 for my horse, and I agree; now, if you do not pay the money immediately this is not a bargain, for my agreement is for the £20, and if you do not pay the money straightway you do not according to my agreement. I ought, however, in this case to wait convenient leisure, to-wit: until you have counted your money. But if you go to your house for the money, am I obliged to wait? No, truly, for I would be in no certainty of my money or of your return, and therefore it is no contract, unless this (delay) be agreed at the communication." In the same case, Brunell, C. J., said, "As has been said, bargains and sales are, as is concluded between the parties, as their intentions can be gathered. For if I sell my horse to you for £10, and we both are agreed, and I accept a penny in earnest, this is a perfect contract; you shall have the horse and I shall have an action for the money. But if I wish to sell my horse to you for £10, and you say that you will give £10 for him, and I say that I am content, still, if you do not pay the money now, but depart from the place, this is no bargain, for I am only content that you shall have my horse for £10, and notwithstanding you say you are content, the transaction is not yet perfect, for you do not pay the money and so do not perform the agreement." And cites Shep. Touch., 224. In these examples no time is mentioned for payment, and it was interpreted to mean immediately. The differences between these and the agreement under consideration are, that in these money is mentioned and the amount is fixed, and in this writing the words *to pay* only are used. The word pay, in this writing, is believed to have the same signification as the word payment. To pay, and to make payment, mean the same. Ordinarily, to purchase goods and pay, or to make payment for them, is to pay in money. If the intention is to pay and to receive pay in something that is not money, but worth as much as, or equivalent to money, it is expected to be specified; other-

wise, it is necessarily held that money is intended. If something else is received, it is done by some other understanding or consent, presumed to be outside of the original writing or agreement. There must be some "universal representative of all value," to answer to and correspond with the value so strongly implied but not expressed in this instrument. Without the existence of money every such contract would necessarily be only the exchange or barter of one specified commodity for another, or would have no meaning. Sales, technically so-called, originated with the invention of money. Now money is necessarily meant whenever the kind of payment is not specified or clearly provided in the agreement.

In this agreement it may have been intended that "convenient leisure" should be "waited," not only to "count the money," but to ascertain the amount to be paid, provided the invoices of the purchase in New York had not been previously examined, and the expenses of shipment and transportation had not been satisfactorily estimated. This, however, being uncertain, no clue to the true intention as to the time of payment can be obtained from it. It does seem, however, from the language, that the time of the arrival of the goods at Ocala, uncertain as it was, was the time at which it should be held that the payment was intended to be made. Under the law governing the interpretation of such a contrived instrument as this is, the time for the payment was immediately, unless some other inference can be reasonably drawn from the language used. The goods were to be shipped, (no time mentioned,) transferred to Ocala, (no time specified.) The half of the original cost of the whole stock was to be paid, with half the cost and charges that may or shall be expended (by Johnston, of course,) in transporting the stock to Ocala. Now if any time of payment other than immediately can be presumed to have been intended by such expressions, it is the time of the arrival of the goods at Ocala. And the language will bear the construction that such was the intention. There are but two constructions, either that

Eichelberger, in consideration that the goods had been purchased and were to be shipped and transported to Ocala, agreed to pay for half of them immediately, and half the expenses of transportation to Ocala, or, as it is not seen that he could have received any benefit if they should not be shipped, or should never reach Ocala, that he was to make both payments and the partnership was to commence on their reaching that town. The law would authorize the former; law and equity the latter construction. The time of the goods reaching Ocala was the time when the contract could have a practical beginning, when the parties to it could begin to give it some practical effect. Then it was that the payment was to be made, according to the true and legitimate meaning of the language of this instrument, and the partnership to begin, if ever, under this contract. Without the payment then, there was no sale; without the sale, this written instrument created no partnership. On the goods reaching Ocala, there was under it something to be done by Eichelberger in order to give force and effect to the agreement. At its date nothing had been done but to agree and to reduce their agreement to writing, signed and sealed. In the above quoted language of Parsons, " *an offer and acceptance.*" The goods were not there; no payment was made. The word " *sold*" in such an agreement means *contracted to sell.* 3 Wendell, 112; 3 Campbell, 326–7, and note. Upon the arrival of the goods, Johnston had done all that could justly have been expected of him under the agreement. The contract was not " *in fieri.*" It had not been actually commenced, never gone beyond the signing of paper. Suppose him to be there, and Eichelberger to claim partnership under the agreement, could not Johnston rightfully claim his pay first, justly refuse to recognize a partnership under that agreement unless the payment was then made? The agreement to the whole of the consideration on both sides, and the payment, was a condition precedent to the partnership. 2 Par. on Con., 189. And without the performance

of which, Johnston could treat the contract as rescinded. 2 Par. on Con., 191; leaving both *in statu quo*. The first thing that Eichelberger in the agreement promised to do, was "to pay." Without that, there was no sale by that agreement, and no partnership. Suppose Johnston to have been absent, and Eichelberger to have taken hold and acted as a partner without paying, and Johnston to have afterwards acquiesced in such action. That would have been acting by virtue of some other or further understanding or agreement beyond and outside of the one that they had put in writing, and no such further or additional agreement is alleged. The bill filed is based upon the agreement in question, and should abide the correct interpretation of it.

But it is contended that the subsequent acts of Johnston constituted a recognition of the partnership under the said written agreement; a waiver of the breach of payment and a postponement of payment, which amounted to letting Eichelberger have the half of the goods as such partner on credit, which credit authorizes payment by set-off. That though Johnston was absent when the goods arrived, and Eichelberger took charge of them, yet when he returned he did not rescind the contract for non-payment, but allowed Eichelberger to continue to act as partner for several months, and until they disagreed about some other business transactions; and that even then, Johnston further recognized the said partnership by consenting to a division of the remainder of the stock of goods with Eichelberger, on the basis of said equal partnership, which division he, Johnston, broke up while in progress.

These acts of Johnston's might bind him to a partnership as to third persons, who are presumed not to know the agreement nor the breach of it; but Eichelberger knew the agreement and avers that he intended to pay Johnston only with a set-off. Under the true legal meaning of the written agreement, this intention of Eichelberger's was a deception upon Johnston. It was an effort to obtain pay for an unliquidated

demand by a contract which made no mention of it, and the language of which meant payment to Johnston in money for half of the goods at once, or at most on the arrival of the goods at Ocala. Johnston finally boxed up and took the remainder of the stock of goods and denied Eichelberger's right to any of them, and that there ever was any partnership between them. Then Eichelberger came into a court of equity to enforce the said written agreement, (which he had never had nor attempted to get in his possession,) claiming it to have been a completed sale and to have established an equal partnership, giving him the right to have his former unliquidated money demand liquidated and paid by pleading it in an amended bill after answer, as a set-off for half of the original stock of goods, &c. He was better than *in statu quo ;* he had taken out of the store $1,834.58 worth of said goods at cost, which, if the said agreement was a perfected sale, and created a partnership, was a breach of it, for it obliged them to sell the goods, contemplating profits to both equally. Here was deception in the making of that written contract, a breach of the true meaning of its language, another breach of it according to the interpretation which he himself put upon it; and then, when refused any further access to the goods, a resort to a court of equity to enforce his plans. · It is equitable to try to obtain payment of lawful demands; but neither law nor equity is intended to be invoked or used in aid of deception, over-reaching, and breach of contract, even in collecting a just demand. He who seeks the aid of a court of equity, must do equity, and come with clean hands. If Johnston permitted Eichelberger to act as his partner in the business of selling those goods, and to take a large part of them on his own account at cost, he cannot be held, without undisputed proof, to have done it under the original written agreement, for that, to say the least, was not binding on him after breach. He must have done it under some other

consent, or understanding, or intention; that Eichelberger alleges nothing of.

It is unnecessary to go into a statement of the accounts, transactions, and demands by and between these parties, nor to decide all the points made in argument by counsel. The case is not one in which a court of equity could have exercised its jurisdiction for relief to Eichelberger, and the bill should be dismissed.